# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LISA COUCH, | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 18-11023-FDS |
| v. | ) ) | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM DECISION OF COMMISSIONER

SAYLOR, J.

This is an appeal of a final decision of the Commissioner of the Social Security Administration ("SSA"). On July 25, 2017, the Administrative Law Judge ("ALJ") issued a decision concluding that plaintiff Lisa Couch is not disabled. The SSA Appeals Council declined review on March 16, 2018. Couch then filed an action with this Court.

Couch seeks reversal of the Commissioner's decision on two grounds. The Commissioner has moved to affirm the decision. For the reasons stated below, the decision will be affirmed.

## I. Background

### A. Factual Background

#### 1. Personal History

Lisa Couch is 38 years old. (A.R. 45). She is a high-school graduate, having completed school in a special-education program. (A.R. 46-57). She initially alleged that her disability

began June 1, 2007, but subsequently amended the alleged onset date to September 21, 2015. (A.R. 49-50). She has not worked since the onset date and has no relevant past employment. (A.R. 29, 49).

At the time of the hearing, Couch lived in a rooming house and spent her time watching television, playing on her phone, and socializing with friends. (A.R. 62-63). She participated in an arts and crafts class four to five times per week for twenty to forty minutes at a time. (A.R. 62). She also shopped for clothes, cooked simple meals, did laundry, and shopped for groceries. (A.R. 63-64).

### 2. **Medical History**

Couch has reported a variety of medical issues, including hypertension, gastroesophageal reflux disease, asthma, hypothyroidism, restless leg syndrome, diabetes, and pulmonary emboli, that are controlled with medication and treatment. (A.R. 19-20). In addition, she had a bunion repair on her right foot in April 2015. (A.R. 21). She also has a history of attention-deficit/hyperactivity disorder ("ADHD"), depressive disorder, and anxiety disorder. (A.R. 24). She has taken Adderall to treat her ADHD symptoms. (*Id.*). She reported that her depression affected her every few days and that her anxiety affected her daily and she experienced frequent panic attacks. (*Id.*).

In April 2016, Couch began treatment with Dr. Yousef Abou-Allaban. (A.R. 702). He noted obesity, loud speech, irritable affect, anger, rage, poor body image, and poor impulse control. (A.R. 702-03). Dr. Abou-Allaban diagnosed ADHD, combined presentation, at the initial visit. (A.R. 703). He continued to treat her through February 2017, and her symptoms and diagnoses remained consistent throughout treatment. (A.R. 688-704).

In May 2016, Couch was treated on four occasions at the UMass Memorial Medical Center for lower extremity pain. (A.R. 955-86). An x-ray on May 14, 2016, showed mild

2

prepatellar edema and a small joint effusion. (A.R. 960).

On June 7, 2016, Dr. Nosheen Ishaque completed a medical source statement concerning Couch's back pain and arthritis. (A.R. 37-40). She concluded that Couch could stand or walk for only two hours in an eight-hour workday; would have to have her legs elevated; and could not lift twenty pounds, twist, stoop, crouch, climb stairs, or climb ladders. (A.R. 37-39). In addition, Dr. Ishaque concluded that Couch would be absent from work more than four days per month, would be unable to do even "low stress" work, and would be off-task at least 25 percent of the day. (A.R. 40). That statement was not submitted to the ALJ but was submitted to the Appeals Council. (A.R. 4).

Nicole Gilson, a nurse practitioner at UMass Memorial Medical Center, began seeing Couch at the orthopedic clinic in July 2016. (A.R. 993). A musculoskeletal exam completed by Gilson revealed weak inversion and eversion, tenderness, and reduced plantar flexion. (*Id.*).

On July 11, 2016, Dr. Abou-Allaban diagnosed generalized anxiety disorder and panic disorder. (A.R. 700). He completed a medical source statement concluding that Couch suffered from mood disorder, generalized anxiety disorder, and ADHD, and had depressed mood and daily panic attacks that responded only partially to treatment. (A.R. 517-21). He further concluded that she was unable to carry out short and simple instructions, maintain attention for two hours, maintain a routine without supervision, work with others without distraction, and perform consistently without unreasonably frequent rest periods. (A.R. 519). In addition, he found that she would be unable to maintain consistent attendance at work and would be absent more than four days per month, and that she would unable to deal with normal work stress. (A.R. 520).

On August 19, 2016, Couch was seen at UMass Memorial for back pain not responding

3

to oxycodone. (A.R. 1278). An examination revealed bilateral paraspinal lumbar tenderness. (A.R. 1282). She presented again later that month with body aches and in October 2016 for low-back pain. (A.R. 1343, 1579). In February 2017, she was seen at UMass for anxiety and at St. Vincent Hospital for pain, tenderness, and swelling in her left ankle. (A.R. 1791).

## II. Procedural History

Couch filed a claim for disability benefits on September 21, 2015, alleging disability beginning June 1, 2007. (A.R. 17, 172-80). The SSA denied her application on February 19, 2016. (A.R. 73-113). On June 1, 2016, she requested a hearing, which was held on April 6, 2017. (A.R. 128). At the hearing, she amended her alleged onset date to September 21, 2015. (A.R. 54). On July 2, 2017, the ALJ found her to be not disabled. (A.R. 14-36).

Couch requested a review of the ALJ's decision. (A.R. 14). On March 16, 2018, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner. (A.R. 8-11). Couch filed this complaint on December 14, 2018, to review the Commissioner's decision. The Commissioner has moved to affirm the decision.

## III. Analysis

### A. Standard of Review

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by "substantial evidence," and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

In applying the "substantial evidence" standard, the Court must bear in mind that it is the

province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

### B. <u>Standard for Entitlement to Disability Benefits</u>

In order to qualify for SSI benefits, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the claimant from performing not only his or her past work, but also any substantial gainful work existing in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic

work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:

Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in that national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's residual functional capacity ("RFC") in combination with vocational factors, including the applicant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

### C. The ALJ's Findings

In evaluating the evidence, the ALJ conducted the five-part analysis called for by Social Security Act regulations.

At step one, the ALJ found that Couch had not engaged in substantial gainful activity during the period since her alleged onset date of September 21, 2015. (A.R. 19).

6

At step two, the ALJ found that degenerative disc disease, osteoarthritis, obesity, ADHD, anxiety disorder, depressive disorder, and personality disorder were severe impairments. (A.R. 19-24). He found that hypertension, gastroesophageal reflux disease, asthma, hypothyroidism, and restless leg syndrome were non-severe and did not limit her ability to work. (A.R. 25). In addition, he found that Couch's history of diabetes, pulmonary emboli, and bunion repair did not limit her ability to work. (*Id.*).

At step three, the ALJ found that Couch did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (A.R. 19, 21). The ALJ evaluated her impairments under listings 1.00 (musculoskeletal system) and 12.00 (neurological disorders) and concluded that the evidence did not support a finding that met the severity listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (A.R. 26). As to the musculoskeletal system, the ALJ found that, viewed in conjunction with her obesity, Couch did not have joint or spinal impairments that limited her ability to ambulate effectively as defined in 1.00(B)(2)(b). (*Id.*). As to mental disorders, the ALJ found that she had moderate limitations in all four "paragraph B" criteria (B1: understand, remember, or apply information; B2: interact with others; B3: concentrate, persist, or maintain pace; B4: adapt or manage oneself). (A.R. 27). He found that she did not have any marked or extreme limitation in any of the "paragraph B" criteria, as shown by her intact orientation, linear thought process, normal speech, ability to socialize on a daily basis, sustaining concentration for up to forty minutes at a time, and adaptability. (*Id.*). He further found that the mental impairments do not satisfy the "paragraph C" criteria because the record does not show that her capacity to adapt to environmental changes is limited. (A.R. 28).

At step four, the ALJ found that Couch had no relevant past work experience. (A.R. 34).

At step five, the ALJ found that Couch had the RFC to perform simple routine tasks for two hours at a time over an eight-hour workday and forty-hour workweek with standard breaks. (*Id.*). She could lift and carry ten pounds frequently and twenty pounds occasionally, and could occasionally balance, stoop, kneel, crouch, crawl, and climb. (*Id.*). She could not interact with the public and could interact with coworkers only on a superficial basis. (*Id.*). The ALJ found that she could understand and remember simple instructions and deal with routine work-setting changes. (*Id.*).

In considering Couch's symptoms, the ALJ followed a two-step process. In step one, he found that her medical impairments could not reasonably be expected to produce the pain and physical symptoms that she claimed. (A.R. 29). He found that despite her repeated visits to the emergency department for pain and muscle weakness, examinations and x-rays consistently yielded normal results and findings of full strength in her extremities and back. (A.R. 29-30). He also found that while her mental-health treatment records showed depression, anxiety, panic disorder, and ADHD, there was no evidence of psychiatric hospitalization or instances of decompensation, and her treatment record also showed that her conditions had been treated somewhat successfully. In addition, he found that she had good eye contact, normal rate of speech, linear thought process, and intact orientation. (A.R. 31-32).

In step two, the ALJ evaluated how the intensity, persistence, and limiting effects of the symptoms limited Couch's work-related activity. (A.R. 28). He found that her daily activities were not consistent with her allegations concerning the severity of her mental impairments. (A.R. 32). She could participate in arts and crafts, socialize with family and friends, prepare meals, do laundry, clean, attend appointments, and grocery shop. (*Id.*). The ALJ gave little weight to the opinion of Dr. Abou-Allaban on the ground that the opinion was inconsistent with

8

the record as a whole. (A.R. 33). The ALJ concluded that Dr. Abou-Allaban's assertions that Couch would be unable to complete unskilled work and adapt to work-setting changes conflicted with his medical assessments that showed her mental impairments to be well-controlled and that she had normal speech, linear thought processes, and intact orientation. (*Id.*). The ALJ also gave considerable weight to the State Disability Determination Service medical and psychological consultants' opinions, which were consistent with the record and indicated that her impairments have remained stable. (A.R. 34).

The ALJ concluded that considering Couch's RFC, age, education, and work experience, there were a significant number of jobs in the national economy that she could perform. (A.R. 35). He relied on the testimony of the vocational expert ("VE") that someone with her same characteristics could work in representative occupations such as merchandise marker, photocopy machine operator, and package sorter. (*Id.*). The ALJ determined that Couch's limitations to simple tasks and instructions was not inconsistent with reasoning level 2 jobs that have "uninvolved written or oral instructions." (*Id.*).

In summary, the ALJ found that Couch did not suffer from a disability between the alleged onset date of September 21, 2015 and July 28, 2017, under § 1614(a)(3)(A) of the Social Security Act. (A.R. 36).

### D. Couch's Objections

Couch raises two objections to the ALJ's decision.

#### 1. Inconsistencies in the Vocational Opinion

First, Couch contends that the ALJ did not resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"), in violation of Social Security Ruling 00-4p. Specifically, she contends that the ALJ's finding that she is limited to simple, unskilled work is inconsistent with a higher reasoning level attributed to the jobs of merchandise marker,

9

photocopy machine operator, or package sorter, according to the General Educational Development ("GED") reasoning scale in the DOT issued by the Department of Labor.

The DOT assigns a GED reasoning level to listed occupations, ranging from Level 1 (the lowest level) to Level 6 (the highest). U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C (4th ed. 1991). Level 1 requires the ability to "carry out simple one- or two-step instructions" and "deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* Level 2 requires the ability to "carry out detailed but uninvolved written or oral instructions" and "deal with problems involving a few concrete variables in or from standardized situations." *Id.* The jobs suggested by the VE all require level 2 reasoning. *See* DOT No. 209.587-034, 1991 WL 680249 (1991) (merchandise marker); DOT No. 207.685-014, 1991 WL 680249 (1991) (photocopy machine operator); DOT No. 222.687-022, 1991 WL 680249 (1991) (package sorter).

Couch has not demonstrated a conflict between a limitation to simple and unskilled work and reasoning level 2 jobs. "Courts regularly have found that DOT reasoning levels two and three are consistent with an RFC limitation to simple and unskilled tasks." *Hargrow v. Colvin*, 2014 WL 1153782, at *17 (D. Mass. Mar. 19, 2014); *see also Lafrennie v. Astrue*, 2011 WL 1103278 (D. Mass. Mar. 23, 2011) (holding that an RFC limitation to simple work is not inconsistent with a DOT reasoning level 2 job because the "DOT definitions, created by the Department of Labor, are not necessarily totally compatible with regulations created by the Social Security Administration"); *Hurlburt v. Colvin*, 2017 WL 1206397, at *8 (D. Mass. Mar. 30, 2017); *Auger v. Astrue*, 792 F. Supp. 2d 92, 97 (D. Mass. 2011) (holding "no conflict existed between the VE's testimony that [plaintiff] could work as a surveillance system monitor despite being limited to 'simple and unskilled' work, and the DOT's level-three classification.").

Accordingly, the first objection does not warrant reversal.

### 2. Opinion of Dr. Ishaque

Couch next contends that the Appeals Council erred in failing to consider the opinion of Dr. Ishaque. She contends that had it done so, it would have changed the outcome of the decision, because she would be limited to 25 percent time off-task and more than four absences per month.

When new and material evidence is submitted to the Appeals Council, it will only consider the evidence if "there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). The Appeals Council's decision to decline to review a case is only reviewable to the extent that it rests on an "explicit mistake of law or other egregious error." *Mills v. Apfel,* 244 F.3d 1, 5 (1st Cir. 2001).

It is well-established that when reviewing the ALJ's decision, the court should not consider additional evidence that was never presented to the ALJ. *Mills*, 244 F.3d at 4 ("To weigh the evidence as if it were before the ALJ would be . . . a very 'peculiar' enterprise . . . and to us one that distorts analysis.") (quoting *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)). The court may, however, consider the additional evidence to determine whether the Appeals Council was "egregiously mistaken" in refusing to review the ALJ's decision. *Mills*, 244 F.3d at 5.

Couch contends that when Dr. Ishaque's opinion is added to the mix, the ALJ's decision clearly becomes contrary to the weight of the evidence. However, Dr. Ishaque's medical source statement from June 7, 2016, is no more than a check-box assessment, and a doctor's opinion "provid[ing] no discussion or analysis . . . goes a long way toward supporting the ALJ's determination to accord [the] opinion little weight." *Greene v. Astrue*, No. 11-30084, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012); (A.R. 37). In addition, Dr. Ishaque's assessment is

11

contradicted by Couch's own testimony. (*Compare* A.R. 39 (Dr. Ishaque indicates Couch can "never" lift twenty pounds) *with* A.R. 60-61 (Couch's testimony that she can "comfortably" lift twenty pounds)). Thus, it is reasonable to assume that the ALJ would have discounted or even rejected Dr. Ishaque's opinion had Couch given him the opportunity to consider it.

Furthermore, under 20 C.F.R. § 416.1470(b), the Appeals Council should only consider additional evidence that was not submitted to the ALJ if the plaintiff makes a showing of good cause. Here, Couch has not attempted to demonstrate good cause for not producing Dr. Ishaque's testimony earlier.

Accordingly, the Appeals Council's assessment of the additional evidence and its decision to decline review of Couch's case was not an error requiring reversal or remand.

## IV. Conclusion

For the foregoing reasons, the motion of defendant to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: June 3, 2019　　　　　　　　　　　　United States District Judge